United States Court of Appeals,

Eleventh Circuit.

No. 95-9149.

DeKALB COUNTY SCHOOL DISTRICT, on its own behalf and on behalf of the children in the DeKalb County School District;  Norma Bergman;  Mike Kelly;  Terry Morris;  Elizabeth Andrews;  Lyman D. Howard;  Phil McGregor, et al., Plaintiffs-Appellees, Cross-Appellants,

v.

  Linda SCHRENKO, in her official capacity as Superintendent of Schools for the State of Georgia;  State Board of Education for the State of Georgia;  Willou Smith, William R. Grow, Edward B. Andrews;  the Department of Education for the State of Georgia;  the State of Georgia;  Zell Miller, in his official capacity as Governor of the State of Georgia;  John Oxendine, in his official capacity as Comptroller General of the State of Georgia;  Steven N. McCoy, in his official capacity as Director of the Fiscal Division of the Department of Administrative Services of the State of Georgia;  Larry D. Thompson;  Johnny Isakson;  Brenda Fitzgerald;  Palmira Braswell;  Phillip A. Wilheit, Sr.;  E.G. Meypohm;  Barbara Archibald, Defendants-Appellants, Cross-Appellees.

April 7, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:90-cv-1769-WCO), William C. O'Kelley, District Judge.

Before ANDERSON, Circuit Judge,  KRAVITCH and HENDERSON, Senior Circuit Judges.

PER CURIAM:

The DeKalb County School District, the members of the DeKalb County Board of Education, and several individuals brought this action against the State of Georgia and its Governor, the State Department of Education, the State Board of Education and its members, the State School Superintendent, and several other state officials to recover transportation and program costs incurred by the plaintiffs because of the desegregation litigation involving the DeKalb County School District's former dual public school system.  The United States District Court for the Northern District

of Georgia awarded the plaintiffs the desegregative transportation costs they sought and ordered the State of Georgia to fund those future transportation expenses. The district court disallowed, however, the plaintiffs' recovery of the costs of their "majority to minority" transfer[1] and magnet school desegregation programs. The state defendants appeal the district court's adverse ruling on the transportation issue, and the DeKalb County plaintiffs filed a cross-appeal to the district court's rejection of their claim for their programmatic costs. For the reasons stated in this opinion, we reverse the district court's judgment granting transportation costs to the plaintiffs and affirm its ruling in favor of the defendants denying the plaintiffs' recovery of their costs incurred in the other desegregation undertakings.

## I. BACKGROUND OF THIS APPEAL

A. *The Desegregation Litigation.*

DeKalb County, Georgia, is a suburban area adjacent to and east of Atlanta.[2] The DeKalb County Board of Education ("DCBE") operates the DeKalb County School System ("DCSS"), the schools within the DeKalb County School District, which, at all times

---

[1]Under the "majority to minority" transfer program, a student could transfer from a school where his race constituted a majority of the student population to a school where his race was in the minority. This program was started by the DCSS on it own initiative in 1972, but was ordered expanded by the district court in 1976.

[2]A small part of the City of Atlanta extends into DeKalb County. That area of DeKalb County is part of the City of Atlanta School System. Similarly, the City of Decatur, located in the central part of DeKalb County, operates an independent municipal school system. The areas within the corporate limits of those two cities are not part of the DeKalb County School System and are not affected by this action.

relevant to this case, was the largest school district in the State of Georgia. Consistent with state law and its own policies and those promulgated by the State Board of Education and the State Department of Education, the DCSS historically operated a segregated, dual system of education with separate schools for black and white students. In 1954, the Supreme Court of the United States declared segregated schools unconstitutional in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and the following year ordered all such segregated school districts to desegregate with "all deliberate speed," *Brown v. Board of Education,* 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955). Those rulings notwithstanding, the DCSS did not commence its desegregation efforts until 1966 when it implemented a "freedom of choice" plan, pursuant to which some black students attended formerly *de jure* white schools.[3]

In 1968, the Supreme Court decided *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), in which the Court held that, if freedom of choice plans failed to adequately end the unlawful segregation of a school district, other means must be utilized to achieve that purpose. Within two months, a class of black students filed suit against the DCSS. In June, 1969, the United States District Court for the Northern District of Georgia entered an order which abolished the freedom of choice plan and enjoined the DCSS from further discrimination on the basis of race. The court ordered the DCSS to close all remaining *de jure*

_____

[3]Additionally, in 1968, the DCBE closed Bruce Street High School, one of two all-black high schools.

black schools and to establish a neighborhood school attendance policy. The court retained jurisdiction to ensure compliance with its order. *See Pitts v. Cherry,* C.A. No. 11946 (N.D.Ga. June 12, 1969).

The parties did not seek any modification of the 1969 order or request additional relief until 1975 when the plaintiffs complained that DCSS had violated the earlier plan. In 1976, the district court ordered the DCSS to expand its "majority to minority" ("M to M") transfer system of assignment, pursuant to which a student could transfer from any school in which his or her race was in the majority to a school in which that race was in the minority, by providing free transportation to the students, and to reassign faculty and staff members so that the racial percentages at each school would approximate those in the system at large. In the late 1970's, the district court considered several plan modifications, not relevant to this litigation, requested by the DCSS.

In 1983, the plaintiffs sought additional relief in the district court.[4] In an order entered following a hearing on the plaintiffs' request, the district court, apparently relying on its 1969 order in the case, asserted that the DCSS had been converted from a dual to a unitary school system in that year. The plaintiffs appealed to this court, which held that the district court had improperly declared the DCSS to be unitary without

---

[4]The plaintiffs contended that the limitation on M to M transfers to predominantly white Lakeside High School and the proposed expansion of Redan High School would have the effect of perpetuating segregation in the system. The district court ordered the DCSS to accept additional black students in the M to M program at Lakeside but declined to enjoin the expansion of Redan.

notifying the plaintiffs and conducting a hearing on that issue. *Pitts v. Freeman,* 755 F.2d 1423 (11th Cir.1985).

In January 1986, the DCSS filed a motion seeking final dismissal of the case, and the district court conducted a three-week bench trial in July, 1987 to determine whether the system had indeed achieved unitary status. In an order entered June 30, 1988, the district court denied the DCSS's motion, concluding that vestiges of the dual system remained in staff assignments, resource allocation and quality of education. The court found, however, that the system had become unitary with regard to student assignments, transportation, physical facilities and extracurricular activities. Accordingly, the court decided that no further relief was necessary in those areas. The district court certified its order for immediate appeal pursuant to 28 U.S.C. § 1292(b), and both sides sought review in this court.[5]

The appellate panel affirmed the district court's judgment that the DCSS had not fulfilled its responsibilities with respect to faculty and staff assignments but reversed its finding that the DCSS had met its obligations in the assignment of students. The court also held that a school system could not be declared unitary until it had maintained racial equality for a period of three years in all of the categories identified by the Supreme Court in *Green.*[6]

---

[5]The plaintiffs did not seek review of the district court's ruling with respect to the areas of transportation, extracurricular activities and facilities. Consequently, the appellate court observed that those issues were not before it.

[6]Under *Green,* the factors to be considered in determining whether a school system has achieved unitary status are student assignment, faculty, staff, transportation, extracurricular activities and facilities. *Green,* 391 U.S. at 435, 88 S.Ct. at

The court, therefore, determined that the DCSS was not being operated as a unitary system. *Pitts v. Freeman,* 887 F.2d 1438, 1450 (11th Cir.1989).

The DCSS petitioned the Supreme Court for review. In 1992, the Supreme Court reversed this court, holding that a district court is permitted to withdraw judicial supervision with respect to discrete categories in which the school district has achieved compliance with a court-ordered desegregation plan. *See Freeman v. Pitts,* 503 U.S. 467, 471, 112 S.Ct. 1430, 1436, 118 L.Ed.2d 108 (1992). According to the Court, "in the course of supervising desegregation plans, federal courts have the authority to relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations." *Id.* at 490, 112 S.Ct. at 1445.[7]

With respect to the case before it, the Court held "the Court of Appeals did err in holding that, as a matter of law, the District Court had no discretion to permit DCSS to regain control over student assignment, transportation, physical facilities, and extracurricular activities, while retaining court supervision over the areas of faculty and administrative assignments and the quality

1692.

[7]The Court noted that the racial composition of the student population of the DCSS had changed dramatically over the years. When the district court first ordered desegregation of the system, only 5.6% of the student population was black; by 1986, the percentage of black students had reached 47%. *Freeman v. Pitts,* 503 U.S. at 475, 112 S.Ct. at 1438. Evidence subsequently introduced in this litigation showed that, by the 1992-93 school year, black students made up 66% of the district's student enrollment. (District court order entered September 23, 1994, at 2).

of education, where full compliance had not been demonstrated." *Id.* at 492, 112 S.Ct. at 1446. Turning to the question whether continuing judicial control over student attendance was necessary to achieve compliance in other areas of the system's operations, the Court noted that the district court, not having its analysis before it, did not have the opportunity to make specific findings and conclusions on this aspect of the case and stated that "[f]urther proceedings are appropriate for this purpose." *Id.* at 498, 112 S.Ct. at 1449.

Complying with the Supreme Court's mandate, this court remanded the case to the district court with the following instructions:

> The issues to be considered by the district court should include, but not necessarily be limited to, faculty and staff assignments (which may or may not involve a re-examination of student assignments), resource allocation, the quality of education being received by all students and the good faith commitment of the school district.

*Pitts v. Freeman,* 979 F.2d 1472, 1473 (11th Cir.1992) (*per curiam*).

The district court subsequently entered orders directing the parties to address whether the DCSS had become unitary with respect to faculty assignments and resource allocation, whether the system had demonstrated good faith in complying with the desegregation order and whether it was providing a quality of education consistent with the letter and spirit of the decree. The court held hearings on these issues in January and March, 1996. In an order entered June 12, 1996, the district court stated that it would "not revisit those ... factors in which a unitary system has already been held to exist. Rather, the court will address only

those issues left open by the 1988 Order, and the appellate and Supreme Court review of that order." *Mills v. Freeman,* 942 F.Supp. 1449, 1454 (N.D.Ga.1996). Thus, the court considered on the merits only the issues of faculty assignments, quality of education, and the DCSS's good faith.[8] The court concluded that the DCSS had achieved unitary status in all respects and granted its motion for final dismissal of the case. *Id.* at 1463-64. No appeal has been taken from that order.

B. *History of this Litigation.*

This lawsuit was filed in 1990 by the DeKalb County School District, the members of the DeKalb County Board of Education, and several parents and students (hereinafter collectively "DeKalb") against the State of Georgia, the Governor, the State Board of Education and its members, the State Superintendent of Schools, the State Department of Education and several other state officials (collectively the "State") seeking to recover its past transportation and other expenses related to its desegregation efforts. In addition, as stated earlier, DeKalb sought injunctive relief requiring the State to help fund its future desegregation expenses. It contended that the State's efforts to impede integration violated the Fourteenth Amendment of the United States Constitution; the Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1701-1758, which, *inter alia,* bars a state education agency from segregating students on the basis of race, color or

---

[8]Given the Supreme Court's opinion in the case and this court's order remanding the case to the district court, the district court could have reexamined the area of student assignments, but the court apparently elected to treat that question as settled by its 1988 order.

national origin and requires an agency which has practiced such segregation to take affirmative steps to remove the vestiges of a dual school system; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which prohibits discrimination on the basis of race in any governmental program that is the recipient of federal funds; and certain provisions of state law.

The case was tried to the court in July 1993. The evidence at trial disclosed that the State funds a portion of each local school district's educational expenditures depending on a number of factors including, since 1985, the wealth of the local district. The State partially reimburses local districts for their transportation expenses based on a formula in use since the early 1960's. Every three years, using maps supplied by the local districts plotting the location of students residing more than 1 and 1/2 miles from their assigned or neighborhood school, state officials draw "ideal" bus routes which will collect those students and deliver them most efficiently to that school. They then calculate the number of route miles and buses needed to transport those students using these ideal routes and determine the amount each district will be allocated for transportation expenses. These calculations are made without regard to the actual schools to which any of the students are assigned or to the local district's actual bus routes or transportation expenses. Consequently, the State does not compensate DeKalb, or any other local district in the state, for the additional expense incurred in transporting the students in its magnet school and M to M transfer programs, who frequently reside long distances from the schools which they

attend.[9]

The district court entered its findings of fact and conclusions of law in an order dated September 23, 1994. The court observed that the State had vigorously resisted the integration of its public schools and had adopted a number of statutes and policies over the years in an effort to preserve segregated schools. The court noted that in the 1960's the State had refused to fund transportation for students outside their local attendance zone except for white students seeking to attend white schools under freedom-of-choice plans. (Order at 6-7).[10] When compulsory busing began to be used to desegregate schools, the State Department of Education adopted in 1972 Policy ED(1)G, which provided that student transportation funds were to be calculated using the school nearest the student's residence having space in the appropriate grade.[11] The court found that this policy was

---

[9]The district court observed that 6,251 students who participated in the M to M transfer and magnet school programs were transported by the DCSS in fiscal year 1992. (Order entered September 23, 1994, at 12-13).

[10]In support of this statement, the district court cited the 1968 deposition of John C. Maddox, Chief of Pupil Transportation Services for the State Board of Education, taken in *United States v. Board of Education of Johnson County, Georgia,* C.A. No. 696, in the Southern District of Georgia. The testimony Maddox actually gave in his deposition, however, does not appear to support the district court's assertion. In fact, in response to a hypothetical question posed by one of the attorneys, Maddox stated that the state would fund the transportation of a black student who was assigned by a local school board to a formerly all-white school as part of a freedom-of-choice desegregation plan. *See* Maddox Dep. at 108-09, Plaintiffs' Exh. 302.

[11]The policy provided the following:

> Pupil transportation funds shall be calculated on the basis of the school having available space in the pupil's grade level nearest the pupil's place of

adopted to discourage desegregative student transfers. (*Id.* at 11-12).[12]  In 1990, DeKalb requested that the State fund the additional transportation expenses required by its magnet and M to M transfer programs.  The State refused, citing Policy ED(1)G and other policies.  The district court found that Policy ED(1)G was repealed in 1991.  It apparently was replaced by a similar provision, a rule adopted by the State Board of Education in November 1990.[13]

The district court concluded that the State's system of calculating reimbursable transportation expenses is not consistent with O.C.G.A. § 20-2-188(d), which directs in part that students "who live beyond one and one-half miles from the school to which they are assigned ... shall be eligible to be counted as

residence.

State Board of Education Policy ED(1)G.

[12]The district court reached this conclusion notwithstanding testimony from Samuel P. McCullough, Jr., Director of Pupil Transportation for the State Board of Education.  In his deposition, taken in the parallel litigation brought on behalf of the Savannah/Chatham County school system, McCullough testified that, in the time period from 1976 to 1986, the State funded bus transportation for students bused to paired schools in noncontiguous attendance zones for desegregation purposes. *See* McCullough Dep. at 95-96.

[13]The new policy stated in relevant part:

(i) Routing shall be as uniform as practical.  Routing shall be planned and operated with minimum bus mileage. Unnecessary travel by empty buses, excessive bus stops, and excess spur routes off the trunk lines shall be eliminated....

(v) Students living within one and one-half miles of school shall not be included in the survey for state allotment purposes.

State Board of Education Rule 160-5-3-.10(2)(a)(1). *See* Plaintiffs' Exhs. No. 75 & 77.

transported students...."  From this, the court held that the State's transportation funding policy violates this provision of state law, the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964.  The court found, however, that the State had not violated the Equal Educational Opportunity Act.  (*Id.* at 20-28).  Using figures supplied by DeKalb [14] and not disputed by the State, the court held that DeKalb was due "$24,632,351 in transportation monies that should have been paid pursuant to state law." (*Id.* at 43).  The court enjoined the State from ignoring magnet and M to M transfer students in its future calculation of transportation funding and ordered the State to base its computation on each student's actual school assignment. (*Id.* at 23).

Turning to DeKalb's request for reimbursement for its magnet school and M to M programs, the district court found that, under Georgia law, DeKalb was primarily responsible for the operation of its public schools and, therefore, for remedying the effects of its earlier dual school system.  The court noted that there was "no evidence ... to suggest that DeKalb's M to M or magnet programs were ever hindered or interfered with by the state or state officials in their initial voluntary form or in their judicially modified form."  (Order at 19).  The court observed that a

[14]DeKalb submitted evidence that the transportation costs of its M to M transfer and magnet school programs for the fiscal years 1978 through 1992 was $34,726,764.00.  According to the plaintiffs, if the State had construed O.C.G.A. § 20-2-188 as did they and the district court, the State would have paid the DCSS a total of $25,372,748.00 over that period rather than the $740,397.00 the State actually paid toward those costs.  The district court arrived at the amount of its award by subtracting the latter figure from the former.

three-judge panel had in an earlier lawsuit "found that no acts on the part of the state had been shown to foster a segregative condition since approximately 1964." (*Id.* at 32, *citing Armour v. Nix,* No. 16708, at 7 & 27 (N.D.Ga. Sept. 24, 1979), *aff'd,* 446 U.S. 930, 100 S.Ct. 2146, 64 L.Ed.2d 784 (1980)). The court further observed that the Supreme Court had affirmed its finding that the DCSS was unitary with respect to transportation and three other of the six factors identified by the Court in *Green.* On this record, the court concluded that it could not "order the state to participate in a remedy for the removal of a vestige of the dual school system which the court has already declared removed." (*Id.* at 30).[15] Therefore, the court refused to order the State to compensate the DCSS for its programmatic desegregation expenses. The court distinguished cases cited by the plaintiffs where state governments had been ordered to pay for desegregation efforts on the ground that those states had much greater responsibility for and authority over local schools. Moreover, the court found that, in those cases, the state or state agencies had been involved in the desegregation litigation from the beginning. Here, in contrast, the DCSS had been under court supervision for over 20 years before filing this action against the State.

Both DeKalb and the State filed motions to alter or amend the judgment. In response to the State's motion, the district court clarified its order to specify that its award of damages to DeKalb

---

[15]This conclusion seems to conflict with the court's decision to require the state to participate in a transportation remedy despite the earlier holding in the desegregation litigation that the DCSS was unitary with respect to transportation.

was based on federal, not state, law, thereby avoiding the bar posed by the Eleventh Amendment to the Constitution. According to the court, it had used state law simply to measure the damages due DeKalb. The court reiterated, however, its finding that the State had not violated the Equal Educational Opportunities Act because "the transportation policy is *not* a vestige of the dual school system...." (Order dated December 19, 1994, at 8) (emphasis in original). As a consequence of DeKalb's motion, the court awarded the plaintiffs an additional $9,259,257 in transportation expenses for the 1993 and 1994 fiscal years. These appeals followed.

## II. STANDARD OF REVIEW

The district court's findings of fact may not be disturbed unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *Robinson v. City of Fairfield,* 750 F.2d 1507, 1510 (11th Cir.1985). Its conclusions of law are subject to de novo review by this court. *Veale v. Citibank, F.S.B.,* 85 F.3d 577, 579 (11th Cir.1996).

## III. DISCUSSION

A. *Defendants' Appeal.*

1. *Retrospective Monetary Relief.*

The State urges that the district court's monetary damages violate the Eleventh Amendment and settled principles of comity and federalism. It notes that the court's September 23, 1994, order repeatedly states that DeKalb is due compensation for the State's violation of O.C.G.A. § 20-2-188, a holding that is barred by the Eleventh Amendment. While conceding that the district court clarified its order by relying on the Fourteenth Amendment and Title VI rather than the state statute as the basis for its award,

the State argues that it is, in substance, one for the violation of state law. It also insists that the district court's decision abridges the political integrity of the State by reallocating a tax burden between DeKalb County taxpayers and those who bear the tax burden in the state-at-large.

The State also maintains that Title VI does not support the award of damages in this case. While admitting that Congress has abrogated the State's Eleventh Amendment immunity with respect to actions brought pursuant to Title VI, the defendants assert that this case is far from a legitimate Title VI action. It alleges that DeKalb County, as a subordinate creation of the state, lacks standing to bring this action against the State. Moreover, noting that this case is simply one for allocating a tax burden, not for substantive relief under the civil rights laws, the State claims that the individual plaintiffs here also lack standing to seek relief against the State.

The Eleventh Amendment to the Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Over a century ago, the Supreme Court made clear that this language also barred suits against a state by its own citizens. *See Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). In short, the Eleventh Amendment constitutes an "absolute bar" to a state's being sued by its own citizens, among others. *See Monaco v. Mississippi,* 292 U.S. 313, 329, 54 S.Ct. 745, 750, 78 L.Ed. 1282 (1934). In the

view of the Supreme Court, the principle of sovereign immunity embodied in the Eleventh Amendment is a broad, fundamental one, which is "among the most stable in our constitutional jurisprudence." *Welch v. State Department of Highways,* 483 U.S. 468, 486, 107 S.Ct. 2941, 2952, 97 L.Ed.2d 389 (1987). The doctrine plays a vital role in our federal system by preventing the sensitive problems which would result from compelling one sovereign to appear in the courts of the other against its will. *Id.* at 486-87, 107 S.Ct. at 2952.

For that reason, absent its consent, a state may not be sued in federal court unless Congress has clearly and unequivocally abrogated the state's Eleventh Amendment immunity by exercising its power with respect to rights protected by the Fourteenth Amendment. *See Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). Of course, Congress may not nullify a state's immunity with respect to alleged violations of state law. For that reason, a federal court may not entertain a cause of action against a state for alleged violations of state law, even if that state claim is pendent to a federal claim which the district court could adjudicate. *Id.* at 117-23, 104 S.Ct. at 917-20. According to the Supreme Court, "[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with

the principles of federalism that underlie the Eleventh Amendment." *Id.* at 106, 104 S.Ct. at 911.

In this case, DeKalb invoked the jurisdiction of the district court by asserting that the State's conduct violated federal rights protected by the Fourteenth Amendment, Title VI and the Equal Educational Opportunities Act. As far as transportation funding is concerned, however, the gravamen of its complaint appears to be that the State has improperly interpreted and failed to adhere to a state statute governing reimbursement for transportation costs. As was noted earlier, the district court's order concluded that DeKalb was due additional "transportation monies that should have been paid pursuant to state law." It is uncontroverted that the damages awarded to DeKalb in this case was measured by application of the disputed Georgia statutory provision, O.C.G.A. § 20-2-188(d). DeKalb's discussion of this issue in its brief before us is almost entirely devoted to state law. Looking at the substance of the district court's judgment, it appears to be one for violation of state law, a holding barred by the Eleventh Amendment. *See Pennhurst,* 465 U.S. at 106, 104 S.Ct. at 911.

Replying to the State's post-judgment motion, the district court modified its initial decision to rest its judgment more clearly on its finding that the State had violated the Fourteenth Amendment and Title VI. Even if we assume that the district court's disposition is based on federal law, the judgment in favor of DeKalb must still overcome the Eleventh Amendment barrier. The Supreme Court has found no general abrogation of Eleventh Amendment immunity for claims brought pursuant to the Fourteenth Amendment.

*See Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). On the other hand, the parties agree that Congress has abolished the states' immunity for causes of action grounded in Title VI. *See* 42 U.S.C. § 2000d-7.[16] Thus, the State could be forced to defend a Title VI action in federal court without its consent.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.[17] While Title VI is not itself an independent source of federal funding, it bars discrimination in over 80 federal programs which provide financial assistance to state and local educational activities. *See* 34 C.F.R. Pt. 100, App. A.

In spite of this bar, it does not appear that any of the plaintiffs here have standing to sue the State for a violation of Title VI. First, it is now clearly the law in this circuit that a political subdivision of a state, such as the DeKalb County School District and its Board of Education, may not maintain a suit for a breach of Title VI against the State in federal court. In *U.S. v. Alabama,* 791 F.2d 1450, 1455-57 (11th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987), a panel of this

---

[16]The abrogation of immunity applies to violations that occur in whole or in part after October 21, 1986, the effective date of the Rehabilitation Act Amendments of 1986, Pub.L. 99-506. *See* 42 U.S.C. § 2000d-7(b).

[17]Pub.L. 88-352, Title VI, § 601, July 2, 1964, 78 Stat. 252.

court held that a state university lacked standing to sue the sovereign that created it under 42 U.S.C. § 1983 for a violation of the Fourteenth Amendment. Furthermore, the court concluded that a state university was not a "person" with rights under Title VI which could be vindicated in a lawsuit against the state. *Id.; see also Knight v. Alabama,* 14 F.3d 1534, 1554 (11th Cir.1994).

DeKalb counters that the plaintiffs can circumvent this obstacle because there are individual citizens who are plaintiffs in this case. The Supreme Court has recognized a private right of action for individuals injured by a Title VI violation. *See Cannon v. University of Chicago,* 441 U.S. 677, 696-97, 99 S.Ct. 1946, 1957-58, 60 L.Ed.2d 560 (1979). Nonetheless, the individual plaintiffs here appear to be only nominally interested in the outcome of this action. The legitimate interests of those individuals are in an integrated educational system in DeKalb County which complies with the requirements of the Constitution, and their rights in those matters have been vindicated by the district court in the underlying desegregation action.[18] No discrete relief was sought in this action in favor of the individual plaintiffs, and none has been awarded for their benefit. Indeed, given that the DCSS is funding all the desegregation measures required by the Constitution, these individuals have suffered no injury at all which could be remedied by the invocation

---

[18]The plaintiffs in the original desegregation litigation could, presumably, have joined the State and its educational agencies as defendants in that suit, but they did not do so. *See, e.g., Stanley v. Darlington County School District,* 84 F.3d 707, 717 (4th Cir.1996).

of Title VI.[19]

It must be emphasized that we are not being called upon to adjudicate the rights of minority students and parents to a quality, unified educational system in DeKalb County. As just noted, those rights have been vindicated in the desegregation lawsuit, and the district court has now declared the DCSS to be a unitary school system, a determination which is not on appeal. The plaintiffs in this action sought only a monetary award to compensate DeKalb for some of its past desegregative transportation and other program costs and an injunction to require the State to help fund those initiatives in the future. In other words, this case is simply about who will pay for the measures undertaken by DeKalb to remedy the effects of the past segregation of its public schools, the taxpayers of DeKalb County alone or the taxpayers of the state as a whole.

If DeKalb had sought this relief in the underlying desegregation suit, it would be more clearly revealed for what it is: a third-party claim for contribution by a political

---

[19]It might be argued that the individual plaintiffs have standing to challenge the State's educational funding practices, or failure to fund certain desegregation programs, because, as DeKalb County taxpayers, their local property taxes may be increased by the State's actions. Even so, in order to have standing to sue in federal court, a plaintiff must allege an injury in fact distinct from that suffered by all or a large class of citizens. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Therefore, with respect to federal taxpayers, the Supreme Court has generally found they lack standing to contest government spending unless the challenge is to government expenditures which allegedly violate the Establishment Clause of the First Amendment. *See Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The same result has been reached when local taxpayers seek to invoke the authority of the federal courts. *See Warth,* 422 U.S. at 508-10, 95 S.Ct. at 2210-11.

subdivision of a state against the sovereign that created it. Yet, a federal court's grant of relief in such an instance would be a serious violation of the most elementary notions of federalism and comity. A state's power to create, abolish and determine the level of public funding of political subdivisions has long been recognized as an element of state sovereignty. *See, e.g., City of Trenton v. State of New Jersey,* 262 U.S. 182, 186, 43 S.Ct. 534, 536, 67 L.Ed. 937 (1923). As the Fourth Circuit Court of Appeals observed in a similar case involving the funding of local school desegregation measures, "[i]t would be an unfathomable intrusion into a state's affairs—and a violation of the most basic notions of federalism—for a federal court to determine the allocation of a state's financial resources. The legislative debate over such allocation is uniquely an exercise of state sovereignty." *Stanley v. Darlington County School District,* 84 F.3d 707, 716 (4th Cir.1996); *see also Harris v. Angelina County, Texas,* 31 F.3d 331, 340 (5th Cir.1994) ("we can think of few greater intrusions on state sovereignty than requiring a state to respond, in federal court, to a claim for contribution brought by one of its own counties"), *Kelley v. Metropolitan County Board of Education of Nashville & Davidson County,* 836 F.2d 986, 998 (6th Cir.1987), *cert. denied,* 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988) (federal court may not "be called upon to adjudicate an internal dispute [over local school funding] between a local governmental entity and the very state that created it"). As a consequence of these jurisprudential barriers, the district court's monetary award for transportation costs against the State cannot stand.

*2. Prospective Injunctive Relief.*

The State also stresses that its arguments concerning Eleventh Amendment immunity and standing apply with equal force to the district court's grant of injunctive relief. It calls attention to the fact that it has been enjoined to adhere to a state funding statute as that statute has been interpreted by a federal court. The result will not be any enhancement of the desegregation programs in DeKalb County, which are already being funded by DeKalb as the Constitution requires, but, rather, a reallocation of resources from poorer, rural school districts to a wealthier suburban district. According to the State, this is beyond the power of the federal courts. As with the damages award, the State attacks DeKalb's standing to advance a Fourteenth Amendment or Title VI claim against it.

Moreover, the State challenges the district court's interpretation of the transportation funding statute at issue here. It takes the position that, since the early 1960's, when nearly every Georgia student attended his neighborhood school, or school for the attendance zone in which he resided, the statute has been construed consistently to provide transportation funding only for students residing more than one and one-half miles from their neighborhood school based on the distance between their homes and that school. Finally, the State argues that DeKalb has failed to identify any nonmonetary injury which it has suffered as a result of the State's interpretation of the statute.

In support of the district court's grant of injunctive relief, DeKalb asserts that such a prospective remedy fits within the

exception to Eleventh Amendment immunity recognized in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). DeKalb points to a number of cases where states have been ordered to help pay for the costs of desegregating local schools and have been enjoined to help fashion remedies for past segregation.

In *Young,* the Supreme Court carved out a "prospective-compliance" exception to the jurisdictional bar of the Eleventh Amendment, holding that a federal court could enjoin *state officials* "who threaten and are about to commence proceedings ... to enforce ... an unconstitutional act...." 209 U.S. at 156, 28 S.Ct. at 452. The exception permits federal courts to enjoin state officials to conform their conduct to the requirements of federal law, even if there is an ancillary impact on the state treasury. *See, e.g., Milliken v. Bradley,* 433 U.S. 267, 289, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977). When, however, "the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its [Eleventh Amendment] immunity from suit even though individual officials are nominal defendants." *Ford Motor Co. v. Department of Treasury of Indiana,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945); *Pennhurst,* 465 U.S. at 101, 104 S.Ct. at 908. A suit that is essentially one against the state is "barred regardless of whether it seeks damages or injunctive relief." *Pennhurst,* 465 U.S. at 101-02, 104 S.Ct. at 909; *see Cory v. White,* 457 U.S. 85, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982).

While a number of state officials are named as defendants in this case in addition to the State of Georgia and its agencies, it

is obvious that this is, in reality, a suit against the State itself. The only action the defendants are required to take to comply with the district court's injunction is to pay from the state treasury the additional funds specified by the district court. If the defendant state officials make those payments, they will not be in contempt of the court's order; if they fail to do so, such failure will constitute contempt. Therefore, as the Sixth Circuit found in *Kelley,* the injunctive relief is ancillary only to itself and does not fall within the *Young* exception. Thus, this action is, in substance, one against the state, a proceeding barred by the Eleventh Amendment.

It is true, as DeKalb points out, that some states have been ordered by federal courts to help fund local desegregation efforts. They cite cases involving the desegregation of the Little Rock, Arkansas, Detroit, Michigan and St. Louis, Missouri school districts, in which state governments were ordered to participate in desegregation remedies. The district court found, however, that the state governments in each of those cases had far greater responsibility for primary and secondary education and much more authority over the local school districts. In addition, the states or state agencies in those cases had participated in the desegregation litigation since its inception. *See, e.g., Little Rock School District v. Pulaski County Special School District No. 1,* 778 F.2d 404, 411-17 (8th Cir.1985) (Little Rock school case); *Bradley v. Milliken,* 540 F.2d 229, 232-34 (6th Cir.1976) (Detroit school case); *United States v. State of Missouri,* 515 F.2d 1365 (8th Cir.1975) (St. Louis school case).

On the other hand, federal courts have refused to require state participation in desegregation remedies when the state's participation was only sought years after the original desegregation litigation was initiated and when the primary responsibility for public education rested with the local school boards. The case factually closest to the present case is *Kelley v. Metropolitan County Board of Education of Nashville & Davidson County,* 836 F.2d 986. In *Kelley,* the Metropolitan County Board of Education of Nashville and Davidson County sued the State of Tennessee some 26 years after the filing of a desegregation suit involving Nashville and Davidson County seeking reimbursement for its past desegregation costs and injunctive relief to compel the State to fund future desegregation efforts. The district court concluded that a retroactive award for past costs would violate the Eleventh Amendment but did enjoin the State to pay for 60% of the local district's future desegregation costs.

On appeal, the Sixth Circuit Court of Appeals held that the grant of prospective relief violated the Eleventh Amendment. *Kelley,* 836 F.2d at 988. The court noted that the case before it was not about the merits of desegregation or various methods for achieving that goal, but simply a contest about money, about who would pay the bill for desegregation measures already in effect. *Id.* at 990. According to the court, the fact that the state had been a constitutional wrongdoer prior to 1956 did not mean it remained a constitutional wrongdoer more than 30 years later. *Id.* at 994. Furthermore, while the state might have an obligation to eliminate the lingering effects of *de jure* segregation, federal law

did not require that the obligation be discharged by payments directly from the state treasury rather than through funds raised by the local school authorities. *Id.*

A similar result was reached in *United States v. Texas Education Agency,* 790 F.2d 1262 (5th Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987). In that case, the Lubbock Independent School District filed a motion to divide the costs of its desegregation measures with the state some 14 years after the original lawsuit was filed. The district court denied the motion, and the Fifth Circuit Court of Appeals affirmed. In the view of that court, the case constituted "the LISD's belated effort to recover costs which smacks of an attempted end-run around the Texas legislature's allocation of state funds. Yet the State has not been an active party to his suit since 1970, and it has never been adjudicated responsible for that segregation in Lubbock which has proven costly to eliminate." *Id.* at 1265.

Finally, the Fourth Circuit Court of Appeals recently rejected efforts to impose on the State of South Carolina some of the costs of desegregating the Darlington County schools. *Stanley v. Darlington County School District,* 84 F.3d 707. There, the district court had permitted the local district to join the State as a defendant approximately 30 years after the original desegregation lawsuit was filed and had ordered the State to pay 15% of the costs of the relief granted in the case. The appellate court reversed, concluding that the district court had wrongfully joined the State in the litigation where neither the original plaintiffs nor the United States as intervenor had sought to pursue

a claim against the State. *Id.* at 715-16. The court held that a federal court lacked authority to entertain a contribution claim by a local school district against the State. *Id.* at 716-17.

In this case, DeKalb filed suit against the State over 20 years after the desegregation case against it began in an effort to shift the burden for some of the costs of its desegregation measures to the State and, by extension, the state's taxpayers at large. That effort is barred by the Eleventh Amendment and elementary principles of federalism.

While the parties have not addressed it, there appears to be an additional problem with a grant of prospective relief in this case. While federal courts have broad equitable powers to remedy the wrongs caused by *de jure* segregation, "it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, 566 (1971). Further, "[a]s with any equity case, the nature of the violation determines the scope of the remedy." *Id.* Therefore, once a local school district has achieved unitary status, the role of the district court comes to an end. *See generally Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). Thus, the Fifth Circuit Court of Appeals has refused to approve additional equitable relief once a school district achieved unitary status. According to that court,

> accommodation of federal superintendence and federalism will not tolerate the idea that although the wrong is righted, the magnitude of the past wrong nonetheless justifies perpetuation of a federal order limiting the ambit of a school district's self-governance. It is state government that we are asked to enjoin. Surely, faithfulness to federalism counsels that

having righted the wrong, the limits we will impose on the state can be drawn no more tightly than the limits of the Constitution.

*United States v. Overton,* 834 F.2d 1171, 1177 (5th Cir.1987).

In this case, the district court has enjoined the State to alter its interpretation of a state statute in order to provide DeKalb with additional state funding for its desegregative transportation programs. Yet, the district court in the desegregation case concluded that DeKalb had achieved unitary status with respect to transportation in 1988, a holding not appealed by the plaintiffs, and that court recently found that the DCSS was unitary in all aspects of its operations. Like the Fifth Circuit Court of Appeals, we do not believe that the prospective injunctive relief granted in this case can be reconciled with a finding that the DCSS has achieved unitary status.[20] In our view, a federal court lacks authority to compel compliance with such an indeterminate prospective order once the Constitutional violation has been remedied. For these reasons, the district court's grant of injunctive relief to DeKalb requiring the State to fund DeKalb's future transportation costs must be reversed.

B. *Plaintiffs' Appeal.*

DeKalb appeals the district court's rejection of its request for reimbursement for some of its non-transportation desegregation costs. In its opinion, the State's history of enforcing

---

[20]For the same reason, we doubt that the district court had authority to award DeKalb its past desegregative transportation expenses once DeKalb had been found to be unitary with respect to its transportation operations. Since we have decided, however, that the district court's award of such expenses must be reversed on other grounds, we need not reach that issue.

segregation renders it liable for at least some of DeKalb's costs in desegregating its schools.

As stated above, the district court found that DeKalb was primarily responsible for operating its public schools and, further, that the State had not impeded DeKalb's M to M or magnet school programs. Therefore, as a factual matter, the State could not be held liable for DeKalb's costs in developing and implementing those desegregation programs. Furthermore, for the reasons discussed earlier respecting DeKalb's transportation expenses, the State may not be required legally to contribute to those costs. DeKalb has not cited any case where there was a similar division of responsibility for public education, and where liability for desegregation costs was sought to be imposed on state government years after the initiation of such efforts, which held the state financially responsible for local school desegregation efforts. The Courts of Appeals for the Fourth, Fifth, and Sixth Circuits have rejected such claims for state contribution in similar circumstances, and we feel compelled to follow their course. *Stanley,* 84 F.3d at 716-17; *United States v. Texas Education Agency,* 790 F.2d at 1264-65; *Kelley,* 836 F.2d at 988-1001. The district court's rejection of DeKalb's claim for programmatic costs is therefore affirmed.

The judgment of the district court is AFFIRMED in part and REVERSED in part.