[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13261
_____

D.C. Docket No. 1:16-cv-04469-SCJ


S&M BRANDS, INC.,

Plaintiff – Appellant,

versus

STATE OF GEORGIA EX REL.,
Christopher M. Carr, Attorney General,

Defendant – Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(May 29, 2019)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and UNGARO,* District
Judge.

---

* Honorable Ursula Ungaro, United States District Judge for the Southern District of
Florida, sitting by designation.

TJOFLAT, Circuit Judge:

S&M Brands, Inc., a tobacco producer, appeals the dismissal of its suit against the State of Georgia.  In its complaint for declaratory and injunctive relief, S&M pleaded several constitutional and state-law violations based on Georgia's scheme of tobacco regulation.  Georgia moved to dismiss, and the District Court granted the motion, dismissing the complaint on the grounds that its allegations did not amount to constitutional violations and its state-law claims were barred by sovereign immunity.  After thorough consideration, and with the benefit of oral argument, we affirm the dismissal of S&M's complaint.

I.

Every tobacco producer that operates in Georgia is licensed to do business via one of two routes.  Many of the producers are parties to the Master Settlement Agreement ("MSA"), a 20-year-old omnibus settlement between the tobacco industry and most U.S. states, including Georgia.  *KT & G Corp. v. Att'y Gen. of State of Okla.*, 535 F.3d 1114, 1118–19 (10th Cir. 2008); *see generally* Nat'l Ass'n of Att'ys Gen., Master Settlement Agreement (1999) (hereinafter "MSA").  These producers—the "participating manufacturers," or PMs—are saddled with ongoing obligations under the MSA, including a collective payment obligation of billions of dollars per year, in exchange for the states' releasing them from liability for state public-health expenditures caused by cigarette smoking.  MSA §§ I, II(jj).

2

Other producers—the "non-participating manufacturers," or NPMs—did not sign the MSA, do not make payments to the states, and could potentially be sued in the future if they incur liability for the states' public-health costs. Since NPMs may become liable, Georgia requires them to self-insure by contracting with an escrow agent to establish an escrow fund into which they pay a set amount per cigarette sold. O.G.C.A. § 10-13-3(2)(A). Otherwise, an NPM could make short-term profits, rack up liability to the state, and then become judgment-proof before the state could recover its public-health expenditures. *Id.* § 10-13-1(f). PMs are not required to self-insure; their liability is already settled, and they are contractually required to make payments. *Id.* § 10-13-3.

NPM escrow funds are governed by the requirements of Georgia's escrow statute, which is implemented and enforced by the Attorney General. *Id.* § 10-13-3(2)(C). The principal funds deposited are available to pay judgments on or settlements of claims like those settled in the MSA. *Id.* § 10-13-3(2)(B)(i). If not paid to the state, the funds are returned to the NPM after 25 years. *Id.* § 10-13-3(2)(B)(iii). The interest and other returns on the invested deposits are paid to the NPM as earned. *Id.* § 10-13-3(2)(B). NPMs must make several quarterly and annual certifications, including that they have complied with the escrow statute and that their funds are governed by a compliant escrow agreement that has been reviewed and approved by the Attorney General. *Id.* §§ 10-13-3(2)(C), 10-13A-

3(d)(2). The Attorney General has exercised his review and approval authority by requiring that each NPM use a model escrow agreement drafted by his office.[1] The Attorney General's model escrow agreement includes investment class restrictions for escrow funds: only cash, a money-market fund, and U.S. Treasury securities are permitted investments. Noncompliance with the escrow statute or the Attorney General's requirements can lead to a statewide ban on sales of the NPM's products. O.G.C.A. §§ 10-13A-4(b), 10-13A-5.

S&M Brands is an NPM and has operated in Georgia for decades. From the signing of the MSA and imposition of the two-route scheme until 2016, S&M performed its obligations under the escrow statute. Back then, the escrow statute did not impose any restrictions on escrow fund investments; the restrictions came solely from the Attorney General's prerogative to deny approval to NPM escrow agreements, informed by the State's general policy of seeking to ensure a source of recovery from potential-defendant NPMs. In 2016, the General Assembly amended the escrow statute, adding a provision that requires the value of the

---

[1] This requirement raises a thorny question of Georgia administrative law: does the Attorney General have discretion to refuse to approve an escrow agreement that meets all the substantive requirements of the escrow statute? Answering that question would require a thorough inquiry into Georgia's Administrative Procedure Act and the caselaw interpreting it. But this issue is not before us—the District Court dismissed S&M's claim raising this point, and S&M has not appealed that ruling—so we will operate under the assumption that the Attorney General's review-and-approval authority allows him to require a specific form agreement.

4

escrow fund not to diminish below the amount paid into it.[2]  2016 Ga. Laws 529–

30.  To implement this amendment, the Attorney General's office modified its

form escrow agreement, changing the list of permitted investments for escrow

funds.  Formerly, escrow monies could be invested in any U.S. Treasury

securities; under the new model agreement, any U.S. Treasury securities bought

with escrow funds must mature in no more than 20 years, although already-

purchased securities may be kept until they mature or are sold.

S&M sued to enjoin the Attorney General from requiring it to use the

revised escrow agreement.  The District Court dismissed the case, and this appeal

followed.  We affirm.

## II.

## A.

S&M alleges that the investment restrictions in the revised escrow

agreement reduce the returns it can expect to earn on its escrow money, and the

Attorney General's imposition of the new restrictions (pursuant to the statutory

amendment) is a "Law impairing the Obligation of Contracts" within the meaning

---

[2] The statute is ambiguous as to what would be required if the value of the escrow investments were to dip below the amount of principal deposited.  If this were to happen, then presumably the NPM could not certify that its escrow fund was compliant; it would have to make up the difference by depositing additional funds in order to so certify.  But the statute makes no express provision for supplemental deposits, and whether such deposits could be required (and how they would be administered) is an open question.  The Attorney General's policy seems to be to try to avoid the question by requiring minimally risky investments.

5

of the Contract Clause. It also alleges that several differences between how the escrow statute is administered for NPMs and how MSA payments are administered for PMs violate the Fourteenth Amendment's Equal Protection Clause. Finally, it alleges that it is owed a release of some excess escrow funds due to having paid more than is required by state law.

We start with S&M's Contract Clause claim. The Contract Clause protects contracting parties' reasonable contractual expectations against unreasonable abrogation by the states. The threshold inquiry is whether the law "operate[s] as a substantial impairment of a contractual relationship" involving the plaintiff. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S. Ct. 2716, 2722 (1978). If an industry is already heavily regulated, regulatory changes that abrogate industry players' contract rights are less likely to be considered substantial impairments. *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 413, 103 S. Ct. 697, 705 (1983). And when the subject matter of the contract itself is already subject to state regulation, the substantial-impairment case is even weaker. *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38, 60 S. Ct. 792, 795 (1940).

Here, S&M's escrow agreement does not give rise to any reasonable contractual expectations that implicate the Contract Clause. Every term of the old model escrow agreement was specifically dictated by the Attorney General as a

condition of approval under O.G.C.A. § 10-13A-3(d)(2).  It is hard to say that such a contract could give rise to *any* reasonable contractual expectations that would implicate the Clause, at least vis-à-vis the state that dictated the terms.[3]  Georgia does not strip itself of police power when it regulates by requiring private parties to contract.  Nor does the Contract Clause ossify the state's regulatory scheme in these circumstances; the general rule, that states can exercise the police power to supersede old regulations, prevails.[4]  So S&M has not plausibly alleged a Contract Clause violation.

## B.

On to S&M's Equal Protection claim.  S&M alleges that it is similarly situated to the PMs, who are also required to pay money into escrow, and that Georgia is discriminating against them in favor of the PMs with no rational basis and in a way that burdens their fundamental right of free speech.  Our threshold inquiry in an Equal Protection case is whether the plaintiff and the proposed comparator are similarly situated, since the Equal Protection Clause requires that

---

[3] The analysis could, of course, be different if the State were a party to the contract, rather than a mere beneficiary.  We do not mean to suggest that the State cannot bind itself by contract to limit some of its own powers. *See U.S. Tr. Co. v. New Jersey*, 431 U.S. 1, 23–24, 97 S. Ct. 1505, 1518 (1977).

[4] "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them. The contract will carry with it the infirmity of the subject-matter." *Hudson Cty. Water Co. v. McCarter*, 209 U.S. 349, 357, 28 S. Ct. 529, 531–32 (1908).

"persons similarly situated . . . be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985); *see also Dawson v. Scott*, 50 F.3d 884, 892 (11th Cir. 1995).  If the plaintiff has not been treated differently than a similarly situated comparator, no Equal Protection violation exists.  *Dawson*, 50 F.3d at 892.

Here, S&M Brands and the other NPMs are not similarly situated to the PMs with respect to the challenged provisions of law.  The PMs have settled their liability to the state; S&M and the NPMs have not.  The PMs need not establish an insurance fund, since Georgia has contract remedies available if a PM fails to make an MSA payment.  S&M makes much of the fact that MSA payments are administered via an escrow system with different investment restrictions than those applicable to NPMs.  But the NPM and PM escrow systems are not comparable: NPM escrow money stays in escrow for 25 years and then returns to the NPM unless taken to pay a claim, while PM payments stay in escrow for only a few days or weeks while the monies owed to each state are apportioned.  The role of escrow is different in PM and NPM regulation, so Georgia may impose different requirements on PM and NPM escrow accounts without violating equal protection.

All the provisions S&M challenges under the Equal Protection clause—the investment restrictions, the quarterly rather than annual deposit schedule, the

8

registered-agent and surety-bond requirements, and the delisting sanction for noncompliance with the escrow statute—are provisions with respect to which PMs and NPMs are not similarly situated.  So S&M has not plausibly alleged an Equal Protection violation.[5]

### C.

S&M's final claim is for a violation of state law; specifically, S&M claims that the Attorney General was required to release escrow funds to it because it paid more into escrow than it was required to under O.C.G.A. § 10-13-3(2)(B)(ii).  The District Court dismissed this claim under Rule 12(b)(1) for lack of jurisdiction.  Because the claim is barred by state sovereign immunity, we affirm.

State sovereign immunity limits federal court jurisdiction.  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 116 S. Ct. 1114, 1122 (1996).  Some suits requesting injunctive or declaratory relief against state officials are not considered suits against the state and thus are not barred by sovereign immunity.  *Ex parte*

---

[5] S&M contends on appeal that its Complaint also states a standalone First Amendment claim.  We disagree.  S&M makes one conclusory allegation of a First Amendment violation in ¶ 114 of its Complaint; this is insufficient on its own to survive a motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009).  S&M argues on appeal that the facts it pleaded show that Georgia is either 1) coercing it to sign the MSA and thus waive its First Amendment rights or 2) neutralizing the effect of its commercial speech by imposing economic disadvantages on it that are not imposed on the PMs.  But neither of these theories are plausibly supported by factual allegations in S&M's Complaint.  S&M has not alleged that it would be better off economically if it joined the MSA, a necessary component of its coercion theory.  Nor has S&M alleged that the restrictions are sufficiently tied to its speech to support a claim on its neutralization theory.  So S&M has not stated a First Amendment claim.

*Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 454 (1908) (injunctive relief); *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646, 122 S. Ct. 1753, 1760 (2002) (declaratory relief).  But when the claim of entitlement to relief is based on a violation of state law, sovereign immunity applies.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121, 104 S. Ct. 900, 919 (1984).  And conclusory allegations that the same conduct that violates state law also violates the U.S. Constitution will not boost the claim over the sovereign-immunity bar.  *DeKalb Cty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 688 (11th Cir. 1997).

*Schrenko*'s facts are on point.  There, a school district sought reimbursement from the state of Georgia for transportation costs.  *Id.* at 684–85.  The entitlement to and amount of reimbursement were determined by a state statute.  *Id.* at 688. Although the school district referenced the Fourteenth Amendment and federal statutory law in its complaint, its claim necessarily relied on a determination that state officials had not complied with state law.  We thus held the claim barred by sovereign immunity.  *Id.* at 690.

Here, S&M's claim is that Georgia is required to release escrow funds back to it.  Georgia's obligation to do this comes from state law; specifically, O.C.G.A. § 10-13-3(2)(B)(ii), which provides for release of excess escrow funds in the event an NPM deposits more than it would have paid in MSA payments were it a PM.  S&M claims that this is really a constitutional claim, since the refusal to release

10

funds serves to coerce it to give up its First Amendment rights and constitutes a Fifth Amendment taking.

We don't buy it.  Here, as in *Schrenko*, the obligation to release (or reimburse) funds comes from state law.  The proper release amount is determined by state law.  Accordingly, the "gravamen of [the] complaint appears to be that the State has improperly interpreted and failed to adhere to a state statute," and *Pennhurst* bars such claims.  *Id.* at 688.  We affirm the dismissal of S&M's state-law claim.

For the foregoing reasons, the dismissal of S&M Brands' Complaint is

**AFFIRMED.**

11